UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| MICHAEL RAY REED, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Case No. 4:06CV18SNL |
|  | ) |  |
| THE LEAR CORPORATION, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM

Plaintiff has filed this Family and Medical Leave Act (FMLA), 29 U.S.C. §2601 *et. seq.* lawsuit alleging that defendant interfered with his FMLA benefits when it denied him leave and terminated him for excessive absenteeism. This matter is before the Court on the defendant's motion for summary judgment (#29), filed October 1, 2007. Pursuant to extensions of time being granted, all responsive pleadings have now been filed and this matter is ripe for disposition. This cause of action is currently set on the Court's trial docket of February 4, 2008.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to

material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Citrate, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d. 986, 990 (8th Cir. 1998)(citations omitted); *see,* Mayer v. Nextel West Corp., 318 F.3d. 803, 806 (8th Cir. 2003) *citing* Keathley v. Ameritech Corp., 187 F.3d. 915, 919 (8th Cir. 1999). However, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Putnam v. Unity Health Systems, Inc., 348 F.3d. 732, 733-34 (8th Cir. 2003) *quoting* Wilson v. Int'l Bus. Mach. Corp., 62 F.3d. 237, 241 (8th Cir. 1995); Girten v. McRentals, Inc., 337 F.3d. 979, 982 (8th Cir. 2003)(plaintiff's

2

theory of age discrimination failed "[b]ecause this theory is supported more by contentions and speculation than evidence, it is insufficient to withstand summary judgment.").

The facts in this case are largely undisputed.[1] Defendant Lear operates a production facility in Bridgeton, Missouri which supplies automotive seats to a Chrysler plant. Plaintiff was hired in August 1997 as a rear seat assembler. Over time, plaintiff developed back pain requiring occasional medical attention. He began to miss work due to his back pain.

In 2003, defendant had an ongoing absenteeism problem at the Bridgeton plant. Many employees, such as the plaintiff, were chronically absent from work for a variety of reasons. Between January 1, 2003 and August 1, 2003, plaintiff had at least nine (9) unexcused absences,

---

[1] In compliance with Local Rule 4.01, defendant submitted a Statement of Uncontroverted Facts (SOF) in support of its summary judgment motion. In response to this SOF, plaintiff agreed with all facts as set forth, except took exception to SOF #19 regarding receipt from Scott Patsoros a letter dated November 16, 2003 denying plaintiff's request for FMLA leave. Plaintiff then sets out his "additional facts". Firstly, in his denial of SOF #19, plaintiff simply refers to his "additional fact ¶14" which describes an alleged conversation that plaintiff's union representative had with a Mr. Kato. The problem is there is no reference to anything in the record to support this alleged conversation as will be noted later in this memorandum. Furthermore, plaintiff's "additional facts" are largely irrelevant and immaterial to the issues present in the instant summary judgment motion. For example, plaintiff contends that he gave medical notes to supervisors at various times prior to August 1, 2003 but the issues in this case are directed only to events after August 1, 2003, especially when he first requested FMLA leave in October 2003. Finally, other "additional facts" are simply not supported by the affirmative record (mostly are supported only by reference to plaintiff's affidavit) and reflect only plaintiff's speculation and /or interpretation. For example, plaintiff in "P-13" states that Mr. Kato was "assigned" to defendant's Bridgeton plant "to work on FMLA issues"; however, Mr. Kato clearly testified in his deposition, that he simply visited all three (3) of defendant's plants between November 2003 and January 2004 to assist with "attendance, grievances, and hiring issues." Kato Deposition, pgs. 15-16, 19-20. All of the statements of material facts contained in defendant's SOF, with exception of #19, will be deemed admitted. As to #19, there is a material dispute in connection with plaintiff's equitable estoppel claim which will be addressed by the Court. As for plaintiff's "additional facts", those that are relevant and properly supported by the record will be deemed admitted. These are P-2, P-4 (except for reference to no doctor's notices after new attendance policy implemented), P-6, P-8 (except for reference regarding defendant telling plaintiff that termination on November 4, 2003 was a "mistake"), P-12 (except for reference regarding Mr. Badolato not understanding letter of November 25, 2003), P-17, and P-24.

3

as well as approximately fourteen (14) vacation days. Prior to August 2003, defendant excused absences if the employee provided a timely doctor's note. During that time, plaintiff advised his supervisors of his back problems and on occasion provided a doctor's note from Dr. Anthony Colaneri, plaintiff's chiropractor.

On August 1, 2003, Lear implemented a new attendance policy, comprised of a point system, under which each full day of absence was recorded as three (3) points. If an employee acquired twenty-four (24) or more points in any rolling twelve (12) month period, s/he was terminated from employment. Under the new attendance policy, up to three (3) consecutive days of absence due to illness (substantiated by a doctor's note) were recorded as a single incident, and only three (3) points assessed. However, if an employee failed to provide a doctor's note, the employee was assessed three (3) points for each day missed.

Employees that were already at the second or third disciplinary level of the old attendance system started the new attendance system one-third (1/3) into the new system, or with eight (8) points. Plaintiff was at the third and final disciplinary level under the old system; therefore, on August 1, 2003, at the implementation of the new attendance policy, he was assessed eight (8) points.

Plaintiff was absent from work on the following dates for which he was assessed points under the new attendance policy: August 18, 2003; October 3, 2003, October 9, 2003; October 17, 2003; October 18, 2003; October 20, 2003; October 27, 2003; October 28, 2003; October 30, 2003; October 31, 2003; December 5, 2003; December 6, 2003; and December 12, 2003. Despite written warnings regarding the excessive accumulation of points, by October 10, 2003 plaintiff had accumulated twenty-one (21) points under the attendance policy and was in jeopardy of termination. Plaintiff's Deposition, pgs. 77-84, 88-92; Defendant's Exhibit B - Affidavit of

4

Scott Patsaros; Defendant's Exhibit F - Deposition of Ronald Conrad, pgs. 24-25; Defendant's Exhibit G. Plaintiff was again given a written warning about excessive absenteeism and the risk of termination of his employment. Plaintiff's Deposition, pgs. 88-92; Conrad Deposition, pgs. 24-25; Defendant's Exhibit H.

Sometime in early October 2003, plaintiff strained his back at work. Acting upon a plant nurse's advice, plaintiff requested an FMLA packet from Lear's Human Resources office in Bridgeton. At the time plaintiff requested the packet, he had already accumulated 21 points, and was subject to termination if he had one more unexcused absence. Plaintiff's Deposition, pgs. 101-05.

The FMLA packet given to plaintiff contained several documents, including information about how to make a request for FMLA leave, a WH-380 form (medical certification form), instructions as to completion of the WH-380 form, a FMLA leave request form, call-in instructions on maintaining compliance with the FMLA, and a document informing employees of their FMLA rights and obligations under the FMLA. Defendant's Exhibit I. Thus, in order to obtain FMLA leave, Lear's employees were required to turn in a completed FMLA request form, and a medical certification form completed by their treating physician or medical care provider indicating the need for time away from work due to a medical condition. The cover letter to the FMLA packet sets forth the documents contained therein, and specifically provides that "[t]here are four pages to be completed by the attending physician **[re Certification of Health Care Provider]**. These forms must be filled out *completely*. Incomplete or improperly filled out paperwork will not be reviewed. (*See section 825.306 of FMLA act*)." The cover letter further provides that "[i]f you have questions, call Mary Bolen at 314-344-1643 or Scott Patsaros at 314-344-1688." Defendant's Exhibit I. Within the packet, is an open letter to employees dated

5

October 14, 2003. Among other admonitions, it advises employees that "[a]nything short of a properly completed Certification form will not allow us to authorize leave time under the Family Medical Leave Act." It further advises employees that "[a]lso be advised that any time off you declare as Family Medical Leave prior to an official approval from the Company is not protected under the Act if your Family Medical Leave event does not qualify and or meet 'final' medical guidelines of your leave." Defendant's Exhibit I. Finally, the packet advises employees:

> "If the leave you have requested is for the serious health condition of yourself or a covered family member, you must provide certification from a licensed health care provider that you are unable to perform the essential job functions of your job or that your are needed to care for a seriously ill family member. Forms for this purpose are available in the Human Resources Department. **Failure to provide this certification in a timely manner will result in the denial of your leave until such certification is provided.**" (emphasis added).

Defendant's Exhibit I. Plaintiff read through the packet, including the materials related to the submission of the medical certification. Plaintiff's Deposition, pgs. 172-73.

On or about October 21, 2003 plaintiff turned in his completed FMLA packet. Defendant's Exhibit I. His packet contained a certification medical form from his chiropractor, Dr. Colaneri. Defendant's Exhibit L. Dr. Colaneri indicated that plaintiff was first treated for his back condition in the doctor's office on June 10, 2003 but that it was not necessary for plaintiff to work intermittently or less than a full schedule as a result of his condition. Defendant's Exhibit L. Colaneri also indicated that plaintiff was "not presently incapacitated." Plaintiff's Deposition, pgs. 168-69; Defendant's Exhibit L. At his deposition, Dr. Colaneri testified that he did not diagnose the plaintiff with a subluxation and never took an x-ray. He further testified that, as of October 21, 2003, he did not indicate a need for plaintiff to have time away from work on the submitted medical certification form as he believed that plaintiff could perform the

essential functions of his job. Defendant's Exhibit M - Deposition of Anthony Colaneri, pgs. 12-13, 32-33, 41-45, 48-49, 69-71.

During the relevant time-period, Scott Patsaros was Lear's Human Resources Specialist at its Bridgeton plant. He was responsible for administering defendant's FMLA program during the relevant time-period. Defendant's Exhibit J - Deposition of Scott Patsaros, pgs. 6-8, 49-50. From the time plaintiff requested the FMLA packet on or about October 15, 2003 to the time he turned in the completed packet on October 21, 2003, plaintiff was absent from work an additional three (3) days: October 17, 18, and 20th. For each of these dates, plaintiff was assessed points. Thus, as of October 21, 2003, plaintiff had amassed thirty (30) points under the attendance policy, and was subject to termination (if it was determined that he did not qualify for FMLA leave).

In his FMLA request, plaintiff sought intermittent FMLA leave starting on or about October 1, 2003, or effective approximately eighteen (18) days before submission. Defendant's Exhibit I.. Scott Patsaros reviewed plaintiff's FMLA request and the medical certification from Dr. Colaneri and determined that the certification did not indicate a need to take work intermittently or work less than a full schedule. Accordingly, on November 4, 2003 plaintiff was given a letter, dated October 22, 2003, from Patsaros notifying him that because his physician had indicated that he was not incapacitated and did not need to take time off work, his request for FMLA leave was being denied. Defendant's Exhibit N. The letter advised plaintiff, that based upon the lack of medical necessity for the time off requested as FMLA leave, "your Family Medical Leave request for this condition has no merit based on the facts supplied and does not warrant time away from work. If your conditions would change that would justify another review, you may supply the Company with a new certification to consider." Defendant's Exhibit

7

N. Plaintiff understood that pursuant to this letter, his FMLA leave request was denied. Plaintiff's Deposition, pgs. 174-75.

In addition to receipt of the October 16, 2003 letter[2], plaintiff met with Ron Conrad, the Assistant Human Resources Manager. He was informed by Mr. Conrad that due to the denial of his FMLA leave request, his employment was being terminated for accumulation of excessive points/violation of the attendance policy. Plaintiff's Deposition, pgs. 174-75, 179; Conrad Deposition, pgs. 7-8, 29-30; Defendant's Exhibit O.

Shortly thereafter, there was a plant-wide rollback of attendance points for those persons who had started under the new attendance policy with eight (8) attendance points. Patsaros Deposition, pgs. 77-78; Conrad Deposition, pgs. 24, 33; Defendant's Exhibit P. On November 10, 2003, as a result of this administrative rollback, plaintiff was reinstated with fifteen (15) attendance points. Defendant's Exhibit P.

On November 10, 2003 plaintiff provided to defendant's Human Resources office a second medical certification from Dr. Colaneri. Defendant's Exhibit Q. Plaintiff sought a second medical certification upon telling Dr. Colaneri that his first FMLA request had been denied because the certification had not indicated a need for time off work. Plaintiff's Deposition, pg. 205. The second medical certification also failed to indicate a need for time off work due to a medical condition. Defendant's Exhibit Q. Dr. Colaneri testified that both

---

[2]In their pleadings, both parties occasionally refer to the October 22, 2003 letter as the "November 4, 2003" letter - the Court presumes that this is because although dated October 22, 2003 plaintiff did not receive it until November 4, 2003. The same thing is applicable to a second letter to plaintiff authored by Patsaros - a letter dated November 16, 2003, but the parties refer to it as the "November 26, 2003" letter because it was not received by the plaintiff until November 26, 2003.

8

medical certifications did not indicate a need for time off work but that he filled them out because:

> "I didn't know if he just wanted to have a record of what his problem was so that if he did - you know, if he did have a more serious problem down the road, that at least they had documentation."

Colaneri Deposition, pgs. 67-68. Furthermore, the second medical certification alluded to this "more serious problem down the road" by noting that plaintiff had an appointment with a neurosurgeon on November 26, 2003 and "we will know the full extent of motion and work schedule after consultation with neurosurgeon"; "[A]fter consultation with neurosurgeon will know better if needs operation or more therapy can't determine until Appt on 11/26/03". Defendant's Exhibit Q.

On November 18, 2003 plaintiff called in and indicated that he needed to be off work that day and the following day "for FMLA". Patsaros Affidavit; Defendant's Exhibit K. Plaintiff then returned to work, and on November 24, 2003 again called in to be off work "for FMLA". Patsaros Affidavit; Defendant's Exhibit K.

On November 26, 2003 plaintiff received a letter from Scott Patsaros denying his FMLA leave request. Defendant's Exhibit R. The letter stated, in pertinent part:

> "Under the Act, once an event takes place that the employee believes may fall under the Family Medical Leave guidelines, the employee has 2-days to inform their employer that it may be FMLA qualified and acquire the necessary paperwork.[3] The

---

[3] In plaintiff's responsive pleading, he claims that a "problem" with the letter is a "misstatement of the law." Document #36, pg. 6 n. 3. It is plaintiff who appears to be mistaken. The letter clearly refers to a past event, which upon returning to work, the employee has two (2) days to make the proper FMLA leave request pertaining to the absence. This is covered by 29 C.F.R. §825.208(e)(1) - if an employee seeks that leave be counted as FMLA leave after the employee has returned to work, the employee must make this request within two days. *See also,* Cotton v. A.T.&T. Operations, 2007 WL 2259318 (E.D.Mo. August 7, 2007).

9

> Company cannot at this time recognize that any such event has
> happened within a 2-day window prior to the receipt of the
> paperwork, therefore, the Company is not obligated to honor
> the certification. The Certification makes note that an
> upcoming doctor's appointment will take place (Nov 26, 2003)
> that may make known the full impact of your condition. With
> the above situations in mind, once you know the impact of your
> condition, any possible time away from work, and the reasons
> for the time away from work, the Company will acknowledge
> a certification that was acquired within the 2-day window as
> noted above."

Defendant's Exhibit R. The letter goes on to state:

> "Any time off you declare as Family Medical Leave prior to
> notification by the Company of `provisional' FMLA or an
> `official" approval will not necessarily be protected under
> the Act. You must meet the stipulation above before any
> consideration for Family Medical Leave will be given."

Defendant's Exhibit R.

Although, at the time of this letter, plaintiff had taken off 11/18/03, 11/19/03, and 11/24/03, defendant did not count these absences against him; i.e. no points were assessed. Thus, as of November 26, 2003 plaintiff had only fifteen (15) points under the attendance system. Patsaros Affidavit.

After receiving this letter, plaintiff did not contact Scott Patsaros or anyone else in Lear's Bridgeton plant's Human Resources office. Plaintiff missed three (3) days of work in December 2003 (12/5/03, 12/6/03, and 12/12/03) due to back pain. He called in for these absences leaving a message that he was taking "FMLA" leave. As a result of these three (3) absences in December 2003, plaintiff was assessed an additional nine (9) points bringing his total to twenty-four (24) points, and subject to termination under the attendance policy.

On January 7, 2004 plaintiff's employment with Lear was terminated for violation of the attendance policy (excessive points). At the time of his termination, plaintiff had not submitted

10

any medical documentation or another medical certification regarding the appointment on November 26, 2003 with a neurosurgeon as noted by Dr. Colaneri.

Defendant Lear contends that 1) plaintiff's claims are time-barred because the denial of his FMLA benefits occurred on November 4, 2003 and November 26, 2003 and plaintiff did not file this action until January 5, 2006 and therefore, said claims are barred by the two-year statute of limitations for FMLA; and 2) plaintiff was not entitled to FMLA leave for a variety of reasons, including but not limited to the fact that his medical certifications did not show a need for time away from work. Plaintiff appears to concede that he did not qualify for FMLA leave, but argues that the November 26th letter granted him "provisional" leave that was confirmed by another Lear employee; therefore, defendant is equitably estopped from asserting that he was not qualified for FMLA leave. Based upon his argument that he had been granted "provisional" FMLA leave, plaintiff contends his cause of action did not accrue until his employment was terminated on January 7, 2004, thus, his filing on January 5, 2006 is timely.

After careful consideration of this matter, review of the parties' pleadings and submitted exhibits, and review of the relevant caselaw, the Court finds that there is no material issue of fact as to defendant Lear not granting "provisional" FMLA leave to plaintiff, that plaintiff was not entitled to FMLA leave, and that as a result of the last denial of his request for benefits on November 26, 2003, plaintiff's lawsuit is untimely.

Under the FMLA, an employer is prohibited from denying, restraining, or interfering with an employee's exercise of, or attempt to exercise, any right contained in the FMLA. 29 U.S.C. §2615(a)(1). Interference includes refusing to authorize leave, and discouraging an employee form using such leave. Stallings. v. Hussmann Corp., 447 F.3d. 1041, 1050 (8th Cir. 2006). In an interference claim, an "employee must show only that he or she was entitled to the benefit

11

denied." Stallings, at 1050 *quoting* Russell v. North Broward Hosp., 346 F.3d. 1335, 1340 (11th Cir. 2003). An employee can establish a FMLA interference claim regardless of the employer's intent. Stallings, at 1050. When analyzing a FMLA interference claim, the standard burden-shifting scheme of McDonnell Douglas[4] does not apply. Stallings, at 1051 n.3.

Plaintiff does not dispute the fact that he was not entitled to FMLA leave; instead, he argues that defendant is equitably estopped from asserting that he did not qualify for such leave because the November 25th letter did not deny his request for leave but instead granted him "provisional" leave. Thus, plaintiff contends that when Lear fired him from taking absences during his FMLA "provisional" leave time, rather than either approving the leave outright and excusing the absences, or denying the leave outright and allowing him to cover the absences with accrued vacation days, Lear interfered with his FMLA rights.

"The principle of equitable estoppel declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny that representation." Farley v. Benefit Trust Life Ins. Co., 979 F.2d. 653, 659 (8th Cir. 1992). Equitable estoppel may be used to preclude an employer from asserting that an employee is not eligible for FMLA leave where the employer's representations misled the employee into relying on the leave. Duty v. Norton-Alcoa Proppants, 293 F.3d. 481, 493-94 (8th Cir. 2002); *see also,* Myers v. Tursso Co., Inc., 496 F.Supp.2d. 986, 996-97 (N.D.Iowa 2007); Podkovich v. Glazer's Distributors of Iowa, Inc., 446 F.Supp.2d. 982, 1002-03 (N.D.Iowa 2006); Gurley v. Ameriwood Industries, 232 F.Supp.2d. 969, 974 (E.D.Mo. 2002). In order to establish a claim for equitable estoppel, a plaintiff must show 1) a misrepresentation of fact; 2) reasonable reliance upon the misrepresentation; and 3) a detriment attributable to the reliance upon the

---

[4]411 U.S. 792, 802 (1973).

12

misrepresentation. *See*, Myers v. Tursso Co., at 996; *see also*, Duty v. Norton-Alcoa Proppants, at 493-94; Farley, at 659; Podkovich, at 974. Plaintiff has failed to set forth affirmative evidence establishing any one of these elements of his equitable estoppel claim.

Plaintiff's entire estoppel claim is based upon an alleged statement made by Joel Kato, a visiting Human Resources employee from a Lear facility in Michigan, to plaintiff's union representative, Nick Badolato. Plaintiff contends that Kato was shown Patsaros' November 26th letter and said that plaintiff was on "provisional" leave.

The affirmative evidence before the Court, which no reasonable juror could dispute, is that plaintiff was never told by anyone familiar with his FMLA request, or anyone from defendant's St. Louis Human Resource office that he was granted FMLA leave or "provisional" FMLA leave. Plaintiff testified that he received the FMLA packet from the St. Louis Human Resource office and read it. In the packet were several documents which repeatedly emphasized that medical certification stating that the employee needed the leave because said employee was unable to perform his/her job duties was required and that failure to produce such certification would "result in the denial of your leave until such certification is provided." Defendant's Exhibit I. Plaintiff testified that Tim Murphy, a Human Resources employee, told him that he had to have his physician fill out the paperwork and return it to Lear to see if the plaintiff was eligible for FMLA leave. Plaintiff's Deposition, pgs. 105, 112. Finally, other documents within the package clearly warned plaintiff that any time off he viewed as FMLA leave prior to an "official approval" by Lear would not be protected under FMLA if the absence(s) did not qualify under FMLA or he failed to provide the requisite medical certification. Defendant's Exhibit I.

Plaintiff was well-aware of the medical certification requisite because he understood that the first letter from Patsaros, dated October 22, 2003, denied his FMLA leave request because the

medical certification from Dr. Colaneri failed to state he needed time off due to a medical condition. Plaintiff's Deposition, pgs. 174-75, 204, 206. In fact, he specifically told this to Dr. Colaneri when he asked him for a second medical certification. Plaintiff's Deposition, pgs. 204-05.

Unfortunately, the second medical certification also failed to state that plaintiff needed time off work due to a medical condition. It failed to add any additional information regarding plaintiff's back condition, and in fact, Dr. Colaneri conceded that he would not know whether plaintiff needed any time off work until after plaintiff saw a neurosurgeon on November 26, 2003. Defendant's Exhibit Q.

On November 26, 2003 plaintiff received the second letter from Patsaros (dated November 16, 2003). Again, the letter noted that the medical certification was deficient and that his FMLA leave request was not being approved because plaintiff had still not provided a medical certification indicating that time off work was necessary due to a medical condition. The letter does not state that FMLA leave had been approved or that plaintiff was approved for "provisional" FMLA leave. All the letter says is that after plaintiff sees the neurosurgeon on November 26, 2003, he can submit another medical certification for review. At the end of the letter, Patsaros states: "You must meet the stipulation above **[the medical certification after the November 26, 2003 appointment with the neurosurgeon]** before any consideration for Family Medical Leave will be given." Defendant's Exhibit R. Plaintiff testified that he kept the appointment with the neurosurgeon, but never submitted a third medical certification from either the neurosurgeon or Dr. Colaneri. Plaintiff's Deposition, pgs. 206-07, 224; Patsaros Affidavit.

Thus, the affirmative evidence before this Court is that defendant Lear never stated to plaintiff, orally or in writing, that his FMLA request had been approved or "provisionally

14

approved". The affirmative evidence shows that defendant Lear repeatedly told plaintiff that his FMLA request would not be approved until he provided a proper medical certification indicating that he required time off work for medical reasons, a requirement he was aware he needed to meet.

Plaintiff contends that the November 16th letter was "confusing" to him. Yet, he never asked Patsaros, the author of both letters denying his FMLA request, to explain it to him nor did he seek assistance from anyone else in the Human Resources office at the St. Louis facility. He avers that he showed the letter to Nick Badolato, who in turn allegedly showed it to Kato, who allegedly told Badolato that plaintiff was on "provisional" FMLA leave. Taking the facts in a light favorable to plaintiff, no reasonable juror could view plaintiff's reliance on this alleged statement as reasonable.

Mr. Kato did not work at the St. Louis facility, and more importantly, he was not an employee of the Human Resources office at the St. Louis facility. There is no evidence in the record that Kato was familiar with plaintiff's FMLA request, or had any knowledge that plaintiff had already received one (1) denial letter, or that twice plaintiff had failed to provide adequate medical certification. There is no evidence that Kato ever spoke with Patsaros about plaintiff's FMLA request or the two (2) letters of denial. It is undisputed that Kato never spoke to plaintiff about his FMLA request. Furthermore, plaintiff conceded in his deposition that he did not know if Kato actually read the November 16th letter when he alleged told Badolato that plaintiff was on "provisional" leave. Plaintiff' Deposition, pgs. 125, 221. Plaintiff has not submitted for the Court's review any affidavit or deposition testimony by Badolato, and Kato has testified that he does not recall seeing the letter or making any statement regarding plaintiff having "provisional" FMLA leave granted. Kato Deposition, pg. 34.

15

At the time plaintiff alleges that Kato made the statement regarding "provisional" leave to Badolato, plaintiff knew that Patsaros was the Human Resources employee with the responsibility to oversee plaintiff's FMLA request, that a medical certification stating that plaintiff needed time off from work due to a medical condition had not been provided (twice), that neither letter stated anything about granting FMLA leave or granting "provisional" FMLA leave, and that FMLA leave would not be granted unless a proper medical certification had been provided. No juror could find, under these facts, that plaintiff reasonably relied upon an alleged statement made to a third-party by someone with no knowledge of plaintiff's situation, when plaintiff could have easily obtained any clarification he required by simply contacting Patsaros.

For legal support, plaintiff principally relies on two (2) cases: Duty v. Norton-Alcoa Proppants, *supra.* and Becker v. American Food & Vending Service of America, 2006 WL 1153820 (E.D.Mo. 2006). Both cases are clearly distinguishable from the present case. In Duty, *supra.,* the employer sent the plaintiff a letter which explicitly guaranteed the plaintiff thirty-four (34) weeks of FMLA leave, and plaintiff's medical treatment was scheduled according to this 34-week leave time. However, the employer later informed the plaintiff he had only twelve (12) weeks of FMLA leave time, and since he had not returned to work at the expiration of this revised 12-week period, his employment was terminated. The Eighth Circuit affirmed the application of equitable estoppel because the affirmative evidence showed that the employer had made a clear representation of 34 weeks of FMLA leave which the plaintiff had detrimentally relied upon. Id., at 494.

In Becker, *supra.*, when plaintiff collapsed at work and was home for two (2) weeks, his employer recorded the time off as vacation time. When plaintiff requested to use his remaining vacation days and personal leave time for additional time off work, his employer specifically told

16

him that he was being put on "disability and family leave" and to take all the time he needed to recover. Upon calling his supervisor to report back to work, plaintiff was informed that his employment had been terminated The Court applied equitable estoppel to prevent the employer from denying FMLA coverage because the employer had specifically told the plaintiff he was on "disability and family leave" and the plaintiff had detrimentally relied upon this representation.

In the present case, there is absolutely no evidence before the Court that defendant Lear, or anyone authorized by defendant Lear, told plaintiff that FMLA leave had been granted to him or that "provisional" FMLA leave had been granted to him. All the evidence before the Court is that plaintiff was told twice that his FMLA leave was denied because he had not submitted the proper requisite medical certification, a requirement he was aware he had to meet. *See*, Slentz v. City of Republic, Missouri, 448 F.3d. 1008, 1011 (8th Cir. 2006)(Duty inapplicable because letter sent to Slentz did not explicitly guarantee a specific amount of leave time or leave until a specific date, but only granted statutory minimum of 12 weeks). Furthermore, there is no evidence before the Court that plaintiff took time off in reliance on the alleged statement by Kato to Badolato. It is undisputed that plaintiff took off considerable amount of time prior to the alleged statement by Kato, a great portion of his absences were while he knew for certain his FMLA leave had been denied by the October letter, and more absences after receipt of the second letter which states nothing about granting leave, provisional or otherwise.

Plaintiff has failed to show that Lear made any misrepresentation of a fact; i.e. that he was on "provisional" leave, and that he reasonably relied on this misrepresentation to his detriment. Finally, plaintiff appears to argue in the alternative, that even if he wasn't granted FMLA leave, provisional or otherwise, defendant somehow violated FMLA by not allowing him to use his vacation days. Firstly, since plaintiff did not qualify for FMLA leave, he cannot establish any

17

violation of the FMLA statute. Secondly, plaintiff has failed to show any legal cause of action arising under any statute, even FMLA, for defendant's alleged violation of its own internal policy.

Although the Court finds that summary judgment should be granted to the defendant on the plaintiff's equitable estoppel claim, the Court further finds that plaintiff's FMLA claim is time-barred. There is no dispute that FMLA is governed by a two-year statute of limitations. 29 U.S.C. §2617(c)(1). The Court has found that plaintiff's FMLA request was denied, at the latest, on November 4 and 26, 2003. Since he did not file this cause of action until January 5, 2006, his FMLA claims are time-barred.

Having found that no material issue of fact exist as to the proper denial of plaintiff's FMLA request, the defendant not being estopped from denying FMLA coverage, and the untimeliness of plaintiff's filing of this cause of action, summary judgment will be granted to the defendant on all claims as contained in plaintiff's complaint.

Dated this 31st day of January, 2008.

*[signature]*
SENIOR UNITED STATES DISTRICT JUDGE